INDIAN FORK COAL CORP. et al. v. TENNESSEE MINING & MFG. CO.

Eastern Section.    November 13, 1926.

Petition for Certiorari overruled by Supreme Court May 24, 1927; Petition to rehear overruled by Supreme Court July 15, 1927.

1. **Injunction.   Danger sought to be avoided must govern length of injunction.**
Where a party is entitled to an injunction, the injunction should be coextensive with the danger which is sought to be avoided by it.

2. **Landlord and tenant.   Forfeiture of lease not favored by court of equity.**
Although the enforcement of rights by way of forfeiture is not favored by courts of equity, yet when justified, it will be exercised.

3. **Landlord and tenant.   Lease held to have a valid clause of forfeiture.**
After a careful examination of lease set out in petition, held that the right of declaring a forfeiture exists upon the happening of the contingency that would authorized its exercise.

4. **Landlord and tenant.   Evidence held to show forfeiture of lease.**
Where complainant leased certain coal rights and the lease provided for certain cash payments of rent and also payments of royalty on coal removed from the land and the lessor failed for a number of years to remove coal or to pay cash rent, their only excuse being that they could not secure railroad facilities, but the evidence showed that they could have secured railroad facilities if they had paid for them, held that the lessee was justified in exercising the clause of forfeiture and terminating the contract.

Appeal from Chancery Court of Knox County; Hon. Chas. Hays Brown, Chancellor.

Reversed and bill dismissed.

Pitts, McConnico & Hatcher and John M. Cate, of Nashville, for appellant.

Norman B. Morrell, of Knoxville, for appellee.

SNODGRASS, J.   The bill in this cause was filed to enjoin the defendant from declaring a forfeiture of a mining lease. An answer was filed claiming the right to declare such forfeiture was evidenced in the contract of lease, and denying that the contract was as insisted by the bill.   Proof was taken and the cause was heard before the Chancellor, who, embodying his findings of fact in the same, entered the following decree:

"This cause came on finally to be heard this 6th day of October, 1925, before the Hon. Chas. Hays Brown, Chancellor, etc., upon the original bill and exhibits thereto, and upon the answer of the defendant Tennessee Mining and Manufacturing

Company, the proof and exhibits to the same, and argument of counsel, upon all of which the Chancellor finds and adjudges that the allegations of the original bill have been sustained by the proof; and further finds and adjudges as follows:

"That under date of June 30, 1923, the defendant Tennessee Mining and Manufacturing Company leased to the complainant, R. P. Armistead, as Trustee, certain coal lands located in Anderson and Scott counties, Tennessee, and that, thereafter, by consent of all the parties said lease was transferred and assigned to the complainant Indian Fork Coal Corporation that in spite of efforts on the part of the complainant to procure railroad facilities and service for the operation of said lease, the said complainant has been unable to procure such facilities.

"The court further finds and adjudges that it was the intent and purpose of the lease-contract and agreements by and between the parties that there should be a suspension in the payment of rentals for said leased premises during that period of time in which the lessee, the complainant in this cause, should be unable to procure railroad facilities and service; and the court finds, further, that there has been and is a complete failure in railroad facilities and transportation service in so far as the complainant is concerned, and, for this reason, the court further finds that the complainant is excused from the payment of rentals up to and including the date of this decree, and for a period of twelve months additional time from said date.

"The court further finds and adjudges that by reason of the failure of complainant to receive railroad or transportation facilities of any character, the defendant, Tennessee Mining & Manufacturing Company is estopped from cancelling the said lease between the parties, and the injunction sought by the complainant to restrain the defendant from cancelling said lease for the non-payment of rentals is hereby granted by the court, and shall remain in full force and operation until and including a period of twelve months from the date of this decree.

"The court sustains the exception to the answer of the witness, R. P. Armistead, to a question during his testimony, the said answer of the witness appearing on pages 57 and 58 of his deposition, wherein the said witness undertook to introduce as a part of his answer, exhibit No. 30, to his deposition, being a letter dated November 17, 1923, addressed to C. H. Armistead, and signed by J. E. Rhodes.

"The court further sustains the exception of counsel for the complainant to the cross-examination of the witness Armistead toward the close of his testimony respecting the evidence of said witness before the Tennessee Railroad Commission, such tes-

timony being incompetent and immaterial to the issues in this cause.

"The court is, therefore, of the opinion, and so orders, adjudges and decrees that the injunction in this cause restraining the defendant from cancelling complainant's lease for the nonpayment of rentals, remain in full force and effect for a period of twelve months from the date of this decree, and further adjudges that the cost of the cause be taxed against the defendant, for which cost execution may issue."

Complainants excepted to that part of the decree limiting the injunction to twelve months, and have perfected an appeal therefrom.

The defendant excepted to the decree and to the action of the Chancellor in sustaining exceptions to the cross examination of complainant, the witness Armistead, respecting the evidence of said witness before the Tennessee Public Utilities Commission, and appealed, but failing to perfect same has filed the record and obtained writ of error, and both parties have assigned errors.

The complainant insists that the learned Chancellor erred, after finding all the issues in favor of the complainant and decreeing the complainant's right to the injunction prayed for in the original bill, in arbitrarily limiting the operation and extent of said injunction to a period of twelve months from the date of the decree, to-wit, October 6, 1925.

With regard to this it is insisted by the complainant that the injunction should have been made permanent, or perpetual, so long as the conditions justifying the injunction against the defendant existed.

We think this insistence is correct. If complainant was entitled to an injunction at all, it should have been made coextensive with the danger that was sought to be avoided by it. The question therefore is, was the complainant entitled to the injunction?

The assignments of the defendant are:

"I. The Chancellor was in error in holding that 'it was the intent and purpose of the lease contract and agreements by and between the parties that there should be a suspension in the payment of rentals for said leased premises during that period of time in which lessee should be unable to procure railroad facilities and service.'

"Because the sixth section of said lease contract is an unconditional contract for the payment of monthly rental and this unconditional agreement is not modified by any other provisions of the lease, and there was no agreement, understanding or contract between the parties that said rental should be dependent upon railroad transportation facilities."

"II. The Chancellor was in error in holding that 'by reason of the failure of complainant to receive railroad or transportation facilities of any kind or character the defendant Tennessee Mining & Mfg. Co. is estopped from cancelling the said lease.'

"Because there is no agreement, understanding or contract between the parties that defendant's right to cancel lease is dependent upon complainant having railroad facilities nor have the acts, by word or deed, of defendant been such as to now estop it from cancelling said lease for non-payment of rental."

"III. The Chancellor being in error in the above matters he was further in error in awarding costs against defendant."

As it will not be necessary to consider the assignment made by complainant if those made by the defendant are sustained, the assignments of the defendant will be taken up first.

We think they are all well taken. This was not a bill to reform the lease contract. Rather the bill affirms it, and files the same as exhibit No. 4 thereto. There is a wealth of history of facts and circumstances leading up to the execution of the lease contract, which facts and circumstances are sought to be verified by the exhibition of correspondence and an option contract proceeding the lease, and which are designed to argue the allegation that it was understood and agreed that the right to demand payment of both rentals and royalties was conditioned upon railroad facilities. And there is a statement in the bill to the effect that at the time of the lease the defendant knew of an alleged inability or incapacity of the Tennessee Railroad Company that served that territory to supply the shipping facilities requisite to enable the complainant to comply with its contract, from which it might be inferred that it was intending to ask to be relieved of its contract on the ground of fraud. But as this was not the object of the bill, which affirmed the contract, it is not perceived why it was inserted, as concerning the objects of the bill it was claimed the contract as it existed defeated any right to declare a forfeiture. It was therefore immaterial whether the defendant knew it or not. But this allegation is denied in the answer, and it is insisted in the answer that it does not still appear that the railroad company could not supply the needs of the complainant, if sufficiently provoked by financial considerations. The burden of the argument of the bill and of the insistence from the proof is, that the complainant Armistead and his assignee, who were to enjoy all the profits that might come to them through the successful operation of the lease, nevertheless assumed no very serious obligations in relation thereto with respect to present benefits; but rather, is it insisted, that under the terms of the lease they were authorized to postpone the benefits that might accrue to the lessor, until fate or fortune furnished the sinews for the contemplated enterprise in the shape of railroad facilities, without any

legal necessity upon the part of the complainants doing anything more to bring about the ends desired than to endeavor to contract with the railroad company, that at the time served that section, upon terms most favorable to their enterprise. And this insistence even takes on the form of some implied obligation of the lessor to assume a degree of responsibility in that regard, or that its knowledge of the efforts that were being made by the complainants and its active assistance should be taken as an evidence that it had agreed to such delay without benefit, until sufficient railroad facilities were secured to enable them to ship coal.

The answer, we think, sufficiently meets, with counter-recitation and explanation, this claim, and when we go to the proof we find that no claim is advanced that any representations were made to the complainants by the defendant regarding the ability of the Tennessee Railroad Company to answer the present or future needs of the mining clientele it was attempting to serve in that community; that the complainant made his own independent investigation of the situation regarding the railroad, and took the contract notwithstanding. What, then, does it provide with reference to the authority of the defendant to declare it forfeit? We are aware that the enforcement of rights by way of forfeiture is not a favorite pursuit of a court of conscience, but when conscience would intervene to stay the exercise of such a right, it must find justification in something more than mere arbitrary power. Equity must follow the law, it cannot subvert it. A careful examination of this contract leads us to conclude that this right of declaring a forfeiture exists upon the happening of the contingency that would authorize its exercise.

The lease is dated June 30, 1923, from the defendant to the complainant, R. P. Armistead. It is to run for thirty-five years, and is of certain surface and timber rights in the 750 acres described in the lease, with the right to dig, mine, ship and sell coal from all seams above a certain level; to supply and install all necessary facilities, and the lessor agrees and covenants with the lessee that so long as it is not in default in paying the rents and royalties stipulated and in performing the covenants and agreements contained, it shall at all times during said lease peacefully have, hold and enjoy the said leased coal veins and surface rights demised in the manner aforesaid, without let or hinderance of or from the lessor, and free from any person or persons lawfully claiming the same or any part thereof, except as therein provided. And for all these it is provided in the sixth clause as follows:

"The lessee covenants and agrees to pay to the lessor for the use, occupation and enjoyment of the premises herein leased for the purpose aforesaid, irrespective of the amount of coal mined, a certain yearly rental of one dollar per acre for the first year,

$2.50 per acre for the second year, and $5 per acre for each succeeding year, payable in monthly installments of one-twelfth of the annual rental each, at the office of the lessor in Knoxville, Tenn., on the 20th day of each month succeeding the month for which the rent is due, the first monthly installment to become due and payable on the 20th day of August, 1923.''

The seventh clause provides as follows:

''The lessee hereby covenants and agrees to pay to the lessor for all coal mined on or removed from said premises a royalty of ten (10) cents per ton of two thousand pounds, to keep all necessary reports, records and books showing the amount of coal mined from said property; to deliver or mail to the lessor regularly monthly statements on or about the 10th day of each successive month showing the number of tons of coal mined from said premises during the preceding month, and to pay to the lessor, at its office in Knoxville, Tenn., on or before the 20th day of each month during the continuance of this lease all the royalties accrued for coal mined from said property by the lessee during the preceding month, less the amount of monthly rental as provided in the sixth section hereof; provided, however, that the failure of the lessor at any time to demand and collect the rent or royalty due at any time on the amount of coal actually mined or the giving of a receipt therefor, shall not be construed or operate as a waiver of its right to subsequently insist upon the payment of any liquidated rent or royalty, then, theretofore or thereafter accruing under the provisions of this lease.

''An annual accounting between the lessor and the lessee shall be had at the office of the lessee on or before the 20th day of January in each year for the purpose of finally determining the amount of coal mined from the said property during the next preceding year. At that time the lessee shall show the exact number of tons of coal mined during the preceding year, and shall pay to the lessor any balance that may be due over and above the monthly settlements herein provided for.''

The eighth clause provides as follows:

''The lessee further covenants and agrees that it will install in an operation designed for not less than 1250 tons daily output in capacity on these leased premises, and that within three years from the date of this lease its daily capacity will have reached that amount, transportation facilities permitting.''

With reference to the payments, it is provided further as follows:

''And it is further covenanted and agreed by and between the parties hereto that in the event the lessee shall fail to comply with each, any or all of the requirements, conditions, covenants

or agreements, which by the terms of this lease it is bound to do, perform or keep, or shall violate any of the requirements, covenants, conditions or agreements on its part herein contained, the lessor may give notice to the lessee of failure to comply with the provisions of the lease, and in the event the lessee shall, after sixty days after the giving of said notice, have failed or refused to comply with all the terms and conditions of this lease, including those with regard to the matters referred to in said notice, then this lease shall, at the option of the lessor, become and be terminated and at an end, and all rights and privileges of the lessee hereunder shall cease, and the lessor, its officers and agents, may thereupon enter upon and take possession of the said premises and the aforesaid property and appurtenances in the same manner and to as full an extent as it might or could do at the expiration of the full term of this lease as herein provided; it being expressly understood and agreed that the termination of this lease by the lessor shall not operate to waive or release the claim or lien of the lessor for unpaid royalty for coal previously mined from the property, or for rent or royalty previously accrued under the terms of this lease, or from any other breach of contract or agreement by the lessee, and that an action may thereafter be maintained by the lessor against the lessee upon this lease to recover for such rent or royalty, or for such breach of covenant or agreement; and it being furthermore expressly understood and agreed that in the event of such termination of the lease, during any year of the lease, the rent or royalty, either for coal mined or as rent or royalty for the preceding portion of the year shall be and become immediately payable.''

The lease further provides as follows:

''It is further covenanted and agreed that if at any time during the term of this lease it shall happen by the act of God, the failure of supply of workable coal on the leased property, or the occurrence of faults or other obstructions in the mines, and without the fault or negligence of the lessee, it shall become impracticable with due diligence and capital, by reason of the aforesaid conditions, to carry on mining operations on said tract without loss, then the lessee, on January 1st of any year shall have the right to surrender this lease by giving thirty days notice of such surrender to the lessor in writing and paying to it all the sums of money due or to become due for coal mined or as liquidated rent or royalty for the full period up to the time of such surrender, and in case of such surrender, for any of the causes above described, and of the payment to the lessor of all the money then due or to become due, as aforesaid, then

this lease shall be at an end and become terminated in the same manner and with like effect as if terminated by the lessor in clause 14 herein above.

"It is further covenanted and agreed that in the event the mining operations on said leased premises be terminated through the abandonment of the Tennessee Railroad and in default of other shipping facilities, the lessee shall have the right, at his option, to either surrender this lease on January 1st of any year under the same conditions as are specified in the above paragraph of this clause, or to request a suspension of payment of the rental charge until such time as shipping facilities may be restored.

"It is further covenanted and agreed that if the mining operations on said leased property be suspended by strike of the miners working therein, the lessee shall promptly give written notice to the lessor, if it desires to be released, during the time of such strike from the payment of the proportional part of the rental required for the year; and in order to be entitled to such relief, said lessee shall conclusively show that it is willing and offering to pay the same wages and prices for mining as the operations of other mines in the same vicinity operating under similar conditions are paying, and is willing to continue to pay the same; that its conduct does not differ from other operators in said vicinity and that it will resume operations upon the same terms and conditions as other operators operating under similar conditions in that territory; provided, however, that no strike continuing for a period of less than fifteen (15) days shall be taken into consideration under the provisions of this clause.

"It is further covenanted and agreed that if the mining operations on said leased property be suspended by destruction of the buildings by fire or flood, or if the mines be wrecked by riot or explosions, then and in that event the lessee shall give the lessor prompt notice of its intention to ask to be released from paying the rental hereby required during the period necessary to promptly restore the same to a condition for operation; any relief that said lessee may be entitled to by reason of the provisions of the above paragraph shall be evidenced by a writing signed by the lessor."

It is not insisted that these monthly rentals have not accrued, as payable sometime. Neither is it insisted that they have been paid, except perhaps as to the first year. The insistence is that by the terms of the contract right of action does not accrue therefor, or will never accrue, unless and until railroad facilities sufficient to begin the shipment of coal have been provided.

We do not think the contract bears such a construction, which would enable the complainant to retain defendant's property indefinitely, without compensation for the delay. We are aware it is claimed that from ten to fifteen thousand dollars have been spent by the complainants, but just how much cash value has been placed upon this leasehold does not appear. It seems to have been the purpose to purchase the fee in any property adjacent upon which to place at least a part of the equipment, thus avoiding loss in a possible reversion of the leasehold, and it is likewise insisted that it was not expected that the stock of the company when sold should be any very material asset to employ in the prosecution of its business, but rather that it should be applied as a compensation for the transfer of the lease, and a resort had to a bond issue. How much of this stock has been applied as a part of the ten to fifteen thousand dollars claimed to have been expended does not appear. At any rate, if no obligation existed upon the part of the trustee or his conferees, if such there were or might have been, to negotiate these bonds and procure the equipment, including shipping facilities, then the whole thing was a paper enterprise, a chance speculation, dependent mostly upon the strength and liberality of the Tennessee Railroad Company, as it is practically confessed that there is neither ability or purpose to resort to any other expedient to expedite operations.

In view of this contract the trouble has been with the perspective of the complainants. Defendant owns other lands in the vicinity and has been seeking to lease these lands and procure other development, and this is regarded by complainants somewhat in the nature of an infringement on the partial monopoly supposed to be imposed by the situation of its lease contract on the limited ability of the railroad. Rather should the suggestion be indulged, that if this railroad is a public service corporation, and has refused to perform its functions captiously, it be compelled upon just terms to do so. Or, if indeed it is not able to do so, then it would appear that the need is financial, and can only be served by the employment of necessary capital; and the more there are or may be to aid, the larger the chance to combine a joint success. At any rate these are practical questions that inhered from the beginning, and if complainants cannot contribute successfully to this result, we think they cannot justly complain of a contract that would oblige them to do so or surrender the opportunity. We think that if complainant sustains a loss it is, or will be because it is unable to carry out its ambitious plans for lack of means, and to which fortune refuses to lend its smile.

The payment of rental under the terms of the contract, without reference to the shipment of coal, being one of the terms upon which the property can be held pending the adjustment of all these difficulties, appears also to be, so far as the defendant is concerned, the

only efficient spur to their solution. The consideration for the lease was that the complainant would finance and operate it according to its terms, and though by consent this organization may have been transferred to the company which he organized and directs, it was nevertheless contemplated, we think, that that company which assumed his obligation should carry it out, and in the meantime a rental, not royalty, would be paid as the price of compensation for any delay as to shipment and tonnage, that would mature also a royalty consideration reckoned upon another basis, but which, when considered, would under certain contingencies operate in lieu of the rentals, but not to excuse them. The apt phraseology of the contract, corroborated by a consideration which this construction affords for the delay, we think negatives any question of ambiguity. But if it needed any proof supporting this construction, it has, we think, been amply offered by the complainant Armistead to this effect by paying rentals and applying for a reduction thereof, who has actually testified under oath in another proceeding that the payment of rental was not dependent upon royalties. We think this testimony, exception to which was improperly sustained, established also a judicial estoppel.

It results, therefore, that the Chancellor's decree is reversed and the bill dismissed, with costs against complainants and their sureties.

Portrum and Thompson, JJ., concur.